UNITED STATES of America, Appellee,

v.

Margaret Elaine WILKINSON, a/k/a "Jane Doe", a/k/a "Tippy", Ella Shipp, a/k/a "Ella Stitman", McAvoy Joseph Shipp, a/k/a "Shipp", a/k/a McAvoy Shipp, a/k/a "Mac", Wilfred C. Burch, a/k/a "Billy", Defendants-Appellants.

UNITED STATES of America, Appellee,

v.

Walter Lee HILL, Defendant-Appellant.

Nos. 95–98, 455, Docket 84–1108–1111, 84–1238.

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1984.

Decided Jan. 16, 1985.

As Amended Feb. 22, 1985.

Henry Putzel, III, New York City, for defendant-appellant Margaret E. Wilkinson.

Robin Charlow, The Legal Aid Society, New York City (The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for defendant-appellant Ella Shipp.

Audrey Strauss, New York City (Michelena Hallie, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, of counsel), for defendant-appellant McAvoy Joseph Shipp.

Theodore Krieger, New York City (William C. Chance, Jr., New York City, of counsel), for defendant-appellant Wilfred C. Burch.

Edward J.M. Little, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Howard E. Heiss, Barry A. Bohrer, Asst. U.S. Attys., New York City, of counsel), for appellee.

Victor J. Herwitz, New York City, for defendant-appellant Walter Lee Hill.

Before LUMBARD, MANSFIELD and CARDAMONE, Circuit Judges.

MANSFIELD, Circuit Judge.

After a jury trial in the Southern District of New York before Judge Edward Weinfeld on charges of conspiring to distribute and to possess with intent to distribute heroin and cocaine, 21 U.S.C. § 846, engaging in a continuing criminal enterprise, 21 U.S.C. § 848, possessing cocaine with intent to distribute, 21 U.S.C. § 841(a)(1), and possessing heroin with intent to distribute, 21 U.S.C. § 841(a)(1), four defendants appeal from the following convictions:

(1) Ella Shipp, narcotics conspiracy (Count One), continuing criminal enterprise (Count Two), possessing cocaine with intent to distribute (Count Three), and possessing heroin with intent to distribute (Count Four);

(2) McAvoy Joseph Shipp, narcotics conspiracy (Count One), possessing cocaine with intent to distribute (Count Three), and possessing heroin with intent to distribute (Count Four);

(3) Wilfred Burch, narcotics conspiracy (Count One);

(4) Margaret Elaine Wilkinson, narcotics conspiracy (Count One).

After a separate jury trial before Judge Weinfeld arising out of the same alleged narcotics conspiracy defendant Walter Lee Hill was convicted of conspiracy to distribute and to possess with intent to distribute heroin and cocaine, 21 U.S.C. § 846. His appeal has not been consolidated with those of the other four defendants. However, since the cases involve the same background facts, we heard them on the same argument date and now write a single opinion covering all the appeals.

The evidence, viewed as it must be on appeal in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), reveals a far-reaching narcotics conspiracy, controlled from New York, which involved approximately a dozen people and narcotics sales made in New York and other cities, including Cleveland, Boston and Miami.[1] The central manager of the enterprise was Ella Shipp ("Ella"), who lived in New York with McAvoy Shipp ("Mac"). On June 9, 1982, an undercover FBI agent, Theodore Domine, met her through a confidential informant in Cleveland, Ohio. After giving Domine free samples of heroin and a diluent she explained that she preferred to deal in kilograms, with the least amount being an ounce of heroin for $12,000. On June 15 she gave Domine more details about her extensive narcotics distribution business, which was doing well, and described her luxurious life style in New York, following which she sold him a "40

---

**1.** Evidence introduced exclusively at Hill's trial will be indicated.

package" containing 28.23 grams of heroin for $12,000. On July 1 she invited Domine and the undercover agent with him, John Bell, to New York City, giving them her New York phone number and the Cleveland number of her sister, Elizabeth Thomas, described as knowing where Ella was at all times.

On July 21, 1982, Ella met Domine and Bell in New York City, where she gave them a small quantity of cocaine and explained that she was involved with Mac, who had set her up in the heroin business with "Mafia" people in September 1981. Upon being introduced by her to Mac at their apartment the undercover agents were told by Mac about his cocaine supplier and that he had "lots of connections." Ella advised that she sold kilograms of heroin for $250,000 each, making a $50,000 profit on each sale. She later told Domine that under her arrangement with Mac she would handle the heroin sales while he handled the cocaine. Further negotiations by Ella with Domine in the following months for sale of heroin in varying amounts were aborted for different reasons, on one occasion because Ella's son, Marty Frierson, who was used by her to deliver heroin, panicked in the course of attempting to deliver heroin to Domine at a Cleveland hotel.

The nature and scope of the operations of Ella and Mac were further attested to by Gary Burke and Elaine Vivian Rodriguez, cooperating witnesses. In the spring of 1982 Burke supplied a half-kilogram of cocaine to Mac and Ella at the latter's New York apartment, for which Ella made a $10,000 down payment toward the $29,000 purchase price. Through two associates Burke continued to furnish drugs to Ella during the summer of 1982. On August 28th he delivered 22 to 25 pounds of marijuana to Ella and a half-kilogram of cocaine to Mac, receiving $4,000 from Ella plus an ounce of heroin which, in accordance with her instructions, was delivered to one Robert Cook and an "Ira" in South Carolina in

exchange for $8,500 cash. More narcotics were supplied by Burke to the Shipps in the fall of 1982 until the relationship terminated as a result of a break-up between Ella and Mac and their failure to pay Burke all the money owed him.

Meanwhile, through Rodriguez Ella located another narcotics source, Carlos Cedeno, who in September 1982 delivered a kilogram to Ella and Mac at their New York apartment, for which Ella paid $40,-000. As additional kilograms of cocaine were delivered to her in November by Cedeno Ella arranged with defendant Wilfred ("Billy") Burch, one of her distributors, to obtain cash from his sales, which she used to make payments to Cedeno and Rodriguez, sometimes accompanied by her son, Marty Frierson. On one occasion Mac brought defendant Margaret Elaine Wilkinson ("Tippy"), Ella's sister, from Cleveland to make a payment of $7,000 to Rodriguez and, when the latter asked Ella about supplying drugs directly to Tippy, Ella advised that Tippy used to help Ella sometimes. In all, Cedeno supplied Ella and Mac with approximately $200,000 of cocaine but received only $118,000 from them.

Intercepted telephone conversations revealed that during the period from October 20, 1982 to December 22, 1982, Ella (1) instructed her son Marty Frierson to pick up money and meet with customers; (2) arranged with "Billy" Burch and his employee Viola Reid for delivery of drugs to them and pick-ups of cash from them; (3) gave instructions to her sister Tippy in Cleveland regarding the handling of deliveries to and the payment schedules of customers and associates in Cleveland, including "Chuck," "Big Man," "Veenie" and Leola ("Lee") Moreland; and (4) orchestrated a trip by Walter Hill (during which he was kept under FBI surveillance) by air from Cleveland to her New York apartment to pick up narcotics and return by bus.[2]

Ella's operations continued into 1983 when an undercover Drug Enforcement

2. This evidence linking Hill to Ella was introduced only at his trial.

Administration (DEA) agent, Antonio Rodriguez, pursuant to arrangements made through an informant and Gregg Shipp, Mac's son, negotiated a deal with her for the purchase of an ounce of cocaine. Though the sale was initially aborted on August 15, 1983, it was finally consummated in Gregg Shipp's apartment for $2,400. Upon her arrest on September 8, 1983, Ella was carrying five pocket-sized telephone books containing the names of various codefendants. In Viola Reid's apartment agents found an Ohaus triple-beam balance scale (a type used to weigh narcotics), and one ounce of lactose, a commonly used diluent. In the apartment in which Hill was arrested the arresting agent found a similar scale and $2,200 cash[3]; upon arresting Leola Moreland agents seized 44 packets of heroin and $5,000 in cash.

## DISCUSSION

### Ella Shipp

Ella Shipp contends that there was insufficient evidence to support her conviction under Count 2, which charged her and others with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. We disagree.

Section 848 makes it a separate crime for a person to commit a narcotics felony "in concert with five or more persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management," from which the person "obtains substantial income or resources."[4] Al-

though the government must establish that the person charged acted as an organizer, supervisor or manager, these terms are to be given their ordinary meaning, *United States v. Mannino*, 635 F.2d 110, 116, 117 (2d Cir.1980), and the person need not have been the *dominant* organizer or manager as long as she was in a managerial position with respect to five other persons. *United States v. Losada*, 674 F.2d 167, 174 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982).

These requirements are met by the evidence in the present case. Though Mac introduced Ella to the drug business, she handled negotiations with the suppliers and had him function as a courier, finally directing Burch not to give him any more of the proceeds from the sales. Ella directed Marty Frierson's activities delivering drugs and collecting the proceeds. With respect to Burch, Ella left substantial quantities of drugs with him on consignment and he remitted the proceeds to her. On several occasions Ella ordered Viola Reid, Burch's employee at his fish and chips shop, to bring money to her. Ella's sister Tippy took instructions from her on how to handle narcotics buyers in Cleveland, "Chuck," "Big Man," and "Veenie." The aborted transaction between Gregg Shipp and the DEA Agent shows the extent to which Ella Shipp at that time supervised Gregg Shipp's narcotics activities.[5]

Even with respect to the three distributors in Cleveland—Leola Moreland, "Chuck," and Walter Hill—the jury could reasonably have concluded that Ella organ-

---

**3.** This evidence relating to Hill was introduced only at his trial.

**4.** 21 U.S.C. § 848 provides in pertinent part as follows:
"(b) ... a person is engaged in a continuing criminal enterprise if—
(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—
(A) which are undertaken by such person in concert with five or more other persons

with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
(B) from which such person obtains substantial income or resources."

**5.** Appellant stresses that at a later date Gregg Shipp did sell an ounce of cocaine to DEA Agent Rodriguez. But this does not show that at the time of the aborted initial sale Ella was not supervising Shipp's sales. The statutory standard does not require that the five or more persons who worked in concert with her do so simultaneously. *United States v. Losada, supra,* 674 F.2d at 173.

ized, supervised, or managed their activities. On several occasions Leola Moreland complained to Ella about the quality of the narcotics she was receiving and urged her to get a better supplier so that they would not lose customers. From the instructions Ella gave to Tippy about dispensing drugs to, and collecting money from, Chuck, it was reasonable to conclude that Chuck was someone whom she had organized and who was supervised or managed by her. The tape recording of a conversation between Hill and Ella indicates that he did not simply buy drugs from her but that he depended on her to supply him with drugs, either directly or through Tippy, for sale to customers, presumably in Cleveland. Even if there were insufficient evidence as to these three, there was still sufficient evidence as to at least five.[6]

■ Citing *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957), Ella next argues that if there was insufficient evidence to find that any one of the individuals referred to in the indictment was organized, supervised, or managed by her the Count 2 (continuing criminal enterprise) conviction must be reversed because it would be impossible to know whether the jury relied on that individual in finding the five-person requirement to have been satisfied. We disagree. Even if the evidence were not sufficient as to the nine individuals named in the indictment to whom Judge Weinfeld directed the jury's attention in charging them with respect to the five-person requirement, Ella failed to assert her present claim before the district court. At most her counsel argued that the evidence was insufficient to establish that she acted in concert with five people or in a management role with respect to the requisite number and that a conspiracy could not function as one of the three required predicate acts for the purpose of 21 U.S.C. § 848. These contentions were properly rejected. No proposed jury

instruction on the subject was requested nor was an objection made to Judge Weinfeld's instruction with respect to Count 2. Indeed Ella objected to the government's proposal that the jury render a special verdict on Count 2, which would have required it to specify the persons found to have been managed by her. Thus she clearly waived the alleged error. *United States v. Young*, 745 F.2d 733, 755 (2d Cir.1984); *United States v. Bonacorsa*, 528 F.2d 1218, 1222 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). Nor can we on this record label as "plain error"—a power to be exercised most sparingly, *United States v. Frady*, 456 U.S. 152 n. 14, 102 S.Ct. 1584 n. 14, 71 L.Ed.2d 816 (1982)—the district court's submission of Count 2 to the jury.

■ Ella further argues that affirmance of her conviction on Count 2 (continuing criminal enterprise) would mandate vacation of her conviction on Count 1 (conspiracy) as a lesser included offense and of her sentences on the substantive counts 3 (cocaine) and 4 (heroin). We disagree. Under our recent decision in *United States v. Estrada*, 751 F.2d 128 (2d Cir.1984), the conviction on Count 1 "should be combined with the conviction on the greater offense, i.e., the 848 count" and they should "not exist as separate convictions so long as the § 848 conviction remained in place," thus precluding any prejudice as the result of collateral consequences that might flow from separate convictions, *id.* at 135. Moreover, the cumulative sentences under the substantive counts must survive, in view of our holding in *United States v. Mourad*, 729 F.2d 195, 199, 203 (2d Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), "that cumulative punishment for substantive offenses and a continuing criminal enterprise under § 848 does not violate the double jeopardy clause."

---

6. Appellant argues that because Tippy, Mac Shipp, and Gregg Shipp either had, or sought, independent sources for their narcotics, they could not have been organized, supervised, or managed by Ella Shipp. But the fact that a subordinate seeks or has contacts with other sources does not call for exclusion of the subordinate as one of the required five persons.

*Mac Shipp ("Mac")*

Mac contends that Judge Weinfeld erred in admitting upon the government's redirect examination of its witness Gary Burke a prior consistent statement made by Burke to FBI agents upon his having a year previously entered into a cooperation agreement with the U.S. Attorney's Office in Atlanta, Georgia. Upon its direct examination of Burke the government did not go into his 18-hour Atlanta statement to the FBI. However, upon cross-examination of Burke, who had testified on direct to his narcotics dealings with Ella and Mac, the latter's counsel sought to impeach the witness' credibility by bringing out certain inconsistencies between statements he made at trial and those in the Atlanta statement (and before the grand jury). Upon redirect the prosecutor elicited from Burke that during his tape-recorded FBI interview he had stated that Mac had "some connections some place because he's the one that could get the heroin ... [S]he's got connections, but he's got just as good connections, from my understanding."

■ Judge Weinfeld overruled an objection to the testimony "on the ground that the questioning is warranted by the nature of the cross-examination on the subject" after the government cited Fed.R.Evid. 801(d)(1) as a basis for admissibility. We agree. The prior consistent statement satisfied the tests we established in *United States v. Quinto*, 582 F.2d 224 (2d Cir. 1978). It was consistent with Burke's trial testimony on direct that Mac had some of his own sources for narcotics. It was offered to rebut the implication of recent fabrication or improper influence or motive inherent in the cross-examination testimony of the witness. *See United States v. Lombardi*, 550 F.2d 827, 828 (2d Cir.1977). Finally, the circumstances indicate that the statement was made prior to the time when any motive to falsify arose, i.e., seven months before the filing of the indictment in the present case and long before Burke had entered into any agreement with the U.S. Attorney for the Southern District of New York. *See United States v. Bonan-*

*no*, 430 F.2d 1060, 1062 n. 3 (2d Cir.) (dicta suggesting witness' motive to cooperate arises when indictment is filed), *cert. denied*, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970). Thus, at the time of the FBI interviews it was unlikely that Burke had any motive to implicate Mac, who was not apprehended until well thereafter. *See United States v. James*, 609 F.2d 36, 50 (2d Cir.1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *United States v. Lombardi, supra*, 550 F.2d at 829. Indeed, if Burke had been so inclined it is unlikely that he would have limited himself to two passing references to Mac in the course of 18 hours of interviews. In any event, even if the admission of Burke's prior consistent statement were treated as error it was harmless, *United States v. Ruffin*, 575 F.2d 346, 359 (2d Cir.1978); *see United States v. Moon*, 718 F.2d 1210, 1232 (2d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). Burke's testimony was hardly "a neat condensation of the government's whole case," *United States v. Rubin*, 609 F.2d 51, 64 (2d Cir.1979), *aff'd*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981) (quoting *United States v. Ware*, 247 F.2d 698, 700–01 (7th Cir.1957)).

■ Nor do we find any merit in Mac's contention that the wiretap orders issued by Judge Edelstein and Judge Carter were defective for failure to show, as required by 18 U.S.C. § 2518(1)(c), that other investigative procedures had been tried and failed or would be unlikely to succeed or be too dangerous. We find no reason to disturb Judge Weinfeld's opinion on the subject, 578 F.Supp. 980 (S.D.N.Y.1984), which is entitled to deference, *United States v. Martino*, 664 F.2d 860, 867 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). After thoroughly investigating the feasibility of alternatives, he found that (1) surveillance had been, and would likely continue to be, ineffective; (2) infiltration was unlikely to be successful because of the secretive nature of the enterprise; (3) concerns about the safety of the agents had arisen; (4) reliance on a

search warrant would be premature; and (5) to subpoena Ella Shipp would be worthless, since she was unlikely to testify against her co-conspirators even if she were granted immunity. His reasoned explanation, grounded in the facts of the case, "square[s] with common sense." *United States v. Lilla*, 699 F.2d 99, 105 (2d Cir.1983). This was no "small time narcotics case" of the type faced in *Lilla*, where simple investigative techniques might have sufficed, but a far-flung conspiracy that was impenetrable except by sophisticated electronic means.

### Margaret Elaine Wilkinson ("Tippy")

■ Tippy's sole claim, that Judge Weinfeld erred in failing to give a multiple conspiracy charge, must be rejected for failure to demonstrate any likelihood that multiple conspiracies existed. *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir.1982). Here there were no "separate networks operating independently of each other," *id.* at 89. The fact that Ella sometimes dealt directly with some of Tippy's customers or through others is insufficient to establish separate conspiracies. The members were generally aware of "the size of the middleman's operations," *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977), and there was sufficient evidence to show Tippy's consciousness of the scale and scope of the enterprise. Nor does a single conspiracy "become multiple conspiracies merely because a particular member [Tippy] does not know the identities of some other members [e.g., Burch and Reid in New York]," *United States v. Martino, supra*, 664 F.2d at 876.

In any event Tippy has failed to meet the requirement of showing that she was substantially prejudiced by the district court's failure to give a multiple conspiracies charge. The number of members on trial was few, thus minimizing any "rub-off" or inability of the jury "to weigh the evidence against each defendant carefully and intelligently," *United States v. Ricco*, 549 F.2d 264, 271 (2d Cir.) (quoting *United States v.*

*Lam*, 544 F.2d 58, 66 (2d Cir.1976)), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977). She has, moreover, failed to identify any coconspirator's statement implicating her that would otherwise have been excluded as hearsay. *See United States v. Alessi*, 638 F.2d 466, 475 (2d Cir.1980).

### Wilfred Burch

Burch argues that there was insufficient non-hearsay evidence of his participation in the conspiracy to permit the jury to consider the hearsay or even with the hearsay to find him guilty beyond a reasonable doubt. We disagree.

■ To admit co-conspirator hearsay evidence, the trial judge was only required to find participation by Burch in the conspiracy on the basis of a fair preponderance of the non-hearsay evidence, not beyond a reasonable doubt, *United States v. Geaney*, 417 F.2d 1116, 1119, 1120 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). The evidence, which may be totally circumstantial, *United States v. Ragland*, 375 F.2d 471, 477 (2d Cir.1967), *cert. denied*, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), must be viewed not in isolation but as a whole. *Geaney, supra*, 417 F.2d at 1121.

■ There was sufficient non-hearsay evidence in the eight tape-recorded conversations between Burch and Ella to permit the trial judge reasonably to infer that Burch was a participant in the conspiracy. They disclose discussions of large amounts of money and statements that after Burch received items, described in masked terms as "something" or "it," he would send the money to Ella, either directly, or through Marty Frierson, Mac, or Viola Reid. In one conversation Burch recommended that he and Ella "take numbers" because it would "cut" their exposure (i.e., if they should be arrested) from "sixty years to thirty days or sixty days"—referring to the differences in penalties for dealing in narcotics and conducting "numbers" gambling operations. In their final recorded conversation, Burch said he understood Ella's need to get

"the girl" (a street term for cocaine) for sale during the holidays, and that he would try to help. This evidence clearly established a strong "likelihood of an illicit association," *Ragland, supra,* 375 F.2d at 477, between Burch and his co-conspirators. No such non-hearsay evidence existed in *United States v. Terry,* 702 F.2d 299 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), relied on by Burch. The threshold non-hearsay requirement having thus been satisfied, the balance of the evidence was admissible against Burch and clearly was sufficient to permit the jury to find him guilty beyond a reasonable doubt.

█ Burch next contends that his rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), were violated by the admission against defendant Viola Reid, who did not testify at trial, of a redacted version of her post-arrest statement admitting that in May 1982 she began working at Burch's restaurant and that for a three to four-month period during her employment she daily sold some $200 worth of cocaine. A defendant's *Bruton* rights would be violated, however, only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence. *United States v. Diez,* 736 F.2d 840, 844–45 (2d Cir.1984); *United States v. Burke,* 700 F.2d 70, 85 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Slocum,* 695 F.2d 650, 655 (2d Cir.1982), *cert. denied,* 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983). Here that condition does not exist. The Reid statement, without additional independent evidence, does not connect Burch with the crime. Indeed, there was no reason for the jury to believe that anything had been redacted from her statement. Nor was the statement, in view of the wiretap evidence connecting Burch with the conspiracy, "a vitally important" part of the government's case against Burch, which is essential to a successful invocation of *Bruton. United States v. Wingate,* 520 F.2d 309, 313 (2d Cir.1975),

*cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976).

█ Burch's claim of improprieties in the prosecutor's opening and summations likewise lacks sufficient merit to entitle him to a new trial. The test is whether the statements, viewed against "the entire argument before the jury," *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940), deprived the defendant of a fair trial. *United States v. Praetorius,* 622 F.2d 1054, 1060 (2d Cir.1979), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). The statements objected to at trial, to which we limit ourselves on this appeal in the absence of an objection having been made to others, *United States v. Perez,* 702 F.2d 33, 37 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983), did not go beyond inferences that might normally be drawn from the evidence. The summation constituted a reasonable response to defense counsel's attack on the credibility of the witnesses and attempt to explain incriminating evidence as consistent with innocence. Although the prosecutor's attempt in summation to link Viola Reid's post-arrest statement to Burch's culpability was improper, it was not sufficiently prejudicial, when considered in the context of the court's instruction and all of the government's statements (including its representation that her statement was offered to link her, not Burch, to the conspiracy) to warrant reversal.

█ Similarly we find no error in the district court's other rulings challenged by Burch. In the absence of a showing of substantial prejudice amounting to a miscarriage of justice, the trial judge did not abuse his discretion in denying Burch a severance. *United States v. Cunningham,* 723 F.2d 217, 229–30 (2d Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); *United States v. Sotomayor,* 592 F.2d 1219, 1228 (2d Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979); *United States v. Herrera,* 584 F.2d 1137, 1143 (2d Cir.1978);

*United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Judge Weinfeld also acted well within his discretion in refusing to permit private investigator Kingsley to testify to a statement by defendant Viola Reid that Burch, who did not testify in his defense, was unaware that she was selling drugs out of his store. Assuming that the point was preserved for appeal, which is doubtful, the proposed testimony failed to meet the requirements of Fed.R.Evid. 804(b)(3). *See United States v. McDonald,* 688 F.2d 224, 232–33 (4th Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983). The claim that the trial judge should have given a charge that "an inference cannot be based upon an inference" was waived by Burch's failure to object as required by Fed.R. Crim.P. 30. However, even if it had been preserved it would not amount to reversible error. *United States v. Eustace,* 423 F.2d 569, 571 (2d Cir.1970).

*Walter Hill*

 In raising only the sufficiency of the evidence in support of the conspiracy charge against him, Hill recognizes that he bears "a very heavy burden," *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Tacitly accepting the existence of a conspiracy led by Ella, he acknowledges that "once a conspiracy is shown, only slight evidence is needed to link another defendant with it...." *United States v. Marrapese,* 486 F.2d 918, 921 (2d Cir.1973), *cert. denied,* 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974).

There was clearly sufficient evidence to support the jury's finding Hill guilty.[7] The tape recordings of conversations between Hill and Ella Shipp, from November 3 to December 20, 1982, show the two discussing transactions in which Hill (sometimes through Ella's sister, Tippy) would receive amounts of narcotics and then pay Ella off with the proceeds. From the telephone

conversations between Hill and Shipp on November 3, 1982, and the highly incriminating circumstances surrounding his round-trip from Cleveland to New York on that day, the jury was entitled to conclude that Hill visited Ella in New York to obtain heroin from her and that he returned to Cleveland by bus to avoid an airport security search of himself and the bag he was carrying. Finally, the jury could take into account other telling evidence of Hill's participation in the conspiracy, including the Ohaus triple-beam scale and $2,200 in cash seized from the apartment where he was arrested.

The judgments of conviction are affirmed.

---

7. The evidence discussed in this paragraph was all introduced at the trial of Walter Hill.