**UNITED STATES of America, Appellee,**

v.

**Martin ROMAN, Defendant–Appellant.**

**No. 419, Docket 88–1283.**

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1988.

Decided March 13, 1989.

See also 822 F.2d 261.

Michele Hirshman, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. S.D. New York, Linda Imes, Asst. U.S. Atty., New York City, on the brief), for appellee.

Joel A. Brenner, East Northport, N.Y., for defendant-appellant.

Before FEINBERG, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Martin Roman appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before Peter K. Leisure, *Judge*, convicting him on one count of conspiring to distribute and to possess with intent to distribute heroin, in violation of 21 U.S.C. § 846 (1982) (count 1); one count of engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848 (Supp. IV 1986) (count 2); and six counts of distributing heroin within 1,000 feet of a public school, in violation of 21 U.S.C. §§ 812 and 845a (1982 & Supp. IV 1986) and 18 U.S.C. § 2 (1982) (counts 3–8). Roman was sentenced to concurrent prison terms of 15 years on each count; to consecutive special parole terms of six years on counts 3, 4, and 5; and to consecutive special parole terms of six years on counts 6, 7, and 8, to be served concurrently with the special parole terms on counts 3, 4, and 5. The court also imposed a special assessment of $50 on each count and a fine of $10,000.

On appeal, Roman contends principally that (1) the evidence was insufficient to convict him on any count because of the lack of credibility of the government's key witness, (2) his conviction on the CCE count must be reversed because, *inter alia*, the manner in which the case was submitted to the jury allowed the jury to reach a flawed verdict as to the persons he was alleged to have supervised in that enterprise, (3) the

district court committed various errors in instructing the jury, and (4) his convictions on counts 1 and 3–8 must be combined with his conviction on count 2, because distribution and conspiracy are lesser included offenses within a continuing criminal enterprise. For the reasons below, we find merit only in the contention that Roman's convictions on counts 1 (conspiracy) and 2 (CCE) should have been combined, and we accordingly vacate the judgment in part and remand for that correction; in all other respects, we affirm the judgment of conviction.

## I. BACKGROUND

Roman was initially indicted with nine codefendants on various charges relating to a heroin-distribution operation in the vicinity of E. 106th Street and Second Avenue in Manhattan ("E. 106th"). Following the entry of guilty pleas by most of the codefendants and the filing of a superseding indictment, Roman was tried alone on the charges described above.

### A. The Government's Case

The government's proof at trial consisted principally of the testimony of Patricia Carter, a New York City Police detective who had been assigned to the New York Drug Enforcement Task Force ("Task Force"). Posing as a narcotics dealer, Carter had made seven purchases of heroin in the E. 106th area during a five-month period, for prices totaling some $25,000. Taken in the light most favorable to the government, the evidence showed the following.

On October 10, 1985, Carter was introduced by a confidential informant to codefendant Cruz Camacho. Carter told Camacho she was interested in buying heroin at a discount from the E. 106th operation; Camacho told Carter he used to work for Roman, and he introduced Carter to Roman that day in front of an E. 106th grocery. Roman spoke little English and Carter spoke no Spanish; Camacho translated for them. Camacho told Roman that Carter wished to purchase two "bundles" of heroin at a discount. Bundles were understood to contain 25 glassine envelopes, or "bags," of heroin; the going rate for the E. 106th operation was $250 per bundle. After some discussion, Roman, Camacho, and Carter arrived at a price of $480 for the two bundles, which reflected a $20 discount.

Following these negotiations, Roman departed, instructing Carter and Camacho to wait on the street corner for Roman's man to bring a package. Soon thereafter, Roman reappeared and motioned Camacho and Carter toward him. At about the same time, he motioned for codefendant Jose Roig and spoke to him in Spanish. Roig then sent Camacho to a nearby parking lot to meet codefendant Georgio Martinez; Carter, who remained behind, observed Camacho in the parking lot giving Martinez the money in exchange for the heroin.

On October 16, 1985, Carter and Camacho went to a social club in the E. 106th area for Carter to attempt to purchase additional heroin from Roman. Outside of the club, Camacho recognized a man referred to by Carter at trial as John Doe Red Tee Shirt (hereafter "Red T"); Camacho assured Carter, in Red T's presence, that obtaining heroin from Roman would be possible since Red T worked for Roman and was selling Roman's "product." Red T told Camacho in Spanish that Roman was not around; however, Red T was able to supply Carter with the desired heroin for $480, the price set by Roman on October 10.

Carter returned to E. 106th alone on November 8 and November 14 but was unsuccessful in locating Roman. She did, however, meet another codefendant John Doe, who told her his name was "Ace" and stated that he knew Roman and saw him every day at 10 a.m. because Roman gave him samples to check out prior to offering the product for sale. On November 14, Carter told Ace she wanted to purchase two bundles and that in the near future she wanted to make a larger purchase. Ace promised to tell Roman about the large purchase; in the meantime, he directed Carter to codefendant Pedro Delestre. Carter and Delestre briefly discussed the appropriate price for the heroin, which De-

lestre set at $240 per bundle, reflecting the same discount Carter had obtained in her first two purchases. Carter and Delestre then met Martinez, who obtained two bundles and gave them to Delestre. Carter received the bundles from Delestre and paid Martinez $480 for them.

On November 19, Carter returned to E. 106th, again alone, and encountered Roman walking toward a parking lot. She told Roman she wanted to buy 20 bundles, again at a discount, and he responded by instructing her, in English, to speak with Roig. Roman called to Roig and spoke with him in Spanish. Roig then told Carter that he did not have that quantity of heroin and that he would not contact her when he did. Carter was about to leave when Ace appeared and interceded. After speaking with Roig, Ace informed Carter that Roman did not want to deal with Carter because he had never dealt with her alone. After Carter said she would find Camacho to assist her in making additional purchases, Ace again conferred with Roig and reported back that Ace would do the deal for Roman, selling Carter the 20 bundles, and that Roman would not be present for fear that Carter was an undercover law enforcement officer. Carter, Ace, and Roig then went into the club, where Roig spoke with codefendant Michael Rivera. Rivera then departed, returning shortly with 20 bundles of heroin, for which Carter paid him $4,800. Ace and Roig helped Rivera count the money.

On December 4, Carter went to E. 106th and found Roman in a parking lot; she complained that her last purchase had been short one bag of heroin. In response, Roman told Carter to see Roig; accompanied by Ace, Carter went into the club in search of Roig. Inside they found Rivera and codefendant Juan Navedo. Navedo informed them that Roig was not expected that day, and upon being told by Carter that Roman had sent them, Navedo replied that Roig's absence was unimportant since "we all work for Martin [Roman]." Carter asked to purchase 25 bundles, and Rivera left to ascertain whether this was possible.

Rivera returned to inform Carter that 25 bundles would cost $6,000. Carter protested that the discount was inadequate in light of the volume. Navedo responded that the organization regularly sold 100 bundles to a customer from Connecticut for $240 a bundle. Carter lowered her request to 20 bundles, which Rivera agreed to sell for $4,800. While awaiting delivery, Carter and Ace went to an E. 106th bar called Christopher's, where Roman was working as a bartender. On their way back to the club, Carter and Ace were informed by Navedo that the delivery would be further delayed. Rather than wait, Ace suggested that he and Carter return to Christopher's to talk with Roman. At Christopher's, Ace spoke to Roman in Spanish and then advised Carter that they would complete the transaction in Christopher's or in the parking lot because the authorities were in the area of the club. Ace departed Christopher's for a short time, returning with Navedo and Rivera. The three conversed with Roman in Spanish. Eventually, the sale was completed in the parking lot.

Carter next returned to E. 106th on February 25, 1986, and found only Rivera. She arranged with him the purchase of 30 bundles of heroin for February 27. At about that time Roman drove up and waved Carter over to speak with him. Carter told Roman of her desire to purchase 30 bundles and Roman assured her that she would have no problem and that he would give her a discount. Roman instructed Carter to come directly to him when she returned for the 30 bundles.

When Carter went back to E. 106th on February 27, Roman told her that Roig wished to handle the sale so that he could receive a portion of the profit. Consequently, Roman called Roig over, spoke with him, and asked Carter to wait. While Carter waited in her car, codefendant Adolfo Mangual arrived in the E. 106th area and met with Roman. After departing for a short time, Mangual returned and met with Roig in front of an auto repair garage; immediately thereafter, Roig summoned Carter into the club and told her the heroin was there. When Roig informed Carter that the price for 30 bundles would

be $7,200, however, Carter objected, arguing that she should get a quantity discount, and offering $7,000. Roig stated that he could not sell 30 bundles for that price, and he referred her to Roman. Carter promptly returned to Roman, who spoke to Roig, following which Roig informed Carter that he could sell her 30 bundles for $7,100. Carter agreed, and the transaction was consummated. After Carter left the E. 106th area, Roman, Roig, and Mangual were observed together in the garage, following which Mangual went from the garage into a nearby apartment complex carrying a paper bag.

Carter's final heroin purchase at E. 106th occurred on March 19, 1986. She met Roman at Christopher's and requested another 30 bundles of heroin. Roman responded that since Carter was buying another 30 bundles, he would give her a larger discount, charging only $235 per bundle. While Carter was waiting in her car for the heroin, she was approached by Roig and Martinez. Roig caused some confusion by stating that the price would be "75," which Carter interpreted to mean $7,500. Roman quickly arrived at the scene and assured Carter that Roig had meant $7,050, or $235 per bundle. Roman then instructed Carter to come with him, Roig, and Martinez. Carter and Roig eventually entered the club, where Roig counted the purchase money.

Upon leaving the club, Carter met codefendant Victor Fernandez, who informed Carter, in Roman's presence, that Fernandez would be making the heroin delivery; he told Carter to wait for him in a nearby restaurant. While Carter was waiting, Mangual drove up and parked his car in the garage next to the club; Fernandez shortly thereafter entered the restaurant and told Carter that her package had arrived. Minutes later, he delivered the bundles to Carter, who paid Roig for them. Martinez then came into the restaurant and informed the group that the police were outside.

Immediately after Carter's departure from E. 106th, Task Force members observed Roman, Mangual, and several others conversing on the street. Mangual

then crossed 106th Street, and he and an unidentified individual were seen doing something while leaning into the trunk of the individual's car; Mangual emerged with a white plastic bag and met again with Roman.

The E. 106th investigation concluded on April 22, 1986. Surveillance agents observed Roman and Mangual enter a parking lot and begin leafing through a notebook. After leaving the area for a short time, Mangual returned and spoke briefly with Roman. Mangual soon departed again and was followed down Second Avenue by Task Force agents who eventually motioned him to pull over to the curb. As the officers approached Mangual's car, they saw him attempt to throw something out of it, and they immediately placed him under arrest. They found in the passenger compartment of the car a box containing 2,375 bags of heroin. A later search of the trunk revealed a triple-beam scale and notebooks. Later that afternoon, Roman was arrested in an E. 106th parking lot; at the time of his arrest, he had in his possession $2,466 in cash.

### B. *The Defense Case and the Verdict*

Roman testified in his own behalf. He stated that he had never sold drugs and had never received any money from the sale of drugs. He denied knowing Camacho and said that Carter had tried to discuss narcotics prices with him but he had always sent her away. He stated that Roig, Martinez, Rivera, Mangual, and Fernandez were drug dealers and that Ace was a drug addict. Roman stated that his dealings with these men, however, were wholly innocent. Roman also testified that he worked at Christopher's and at the auto repair garage near the club and that part of the money in his possession at the time of his arrest was his own, and the rest belonged to the owners of Christopher's and the garage.

Roman also called several witnesses who testified, *inter alia*, that Roman spoke little or no English. A bilingual teacher gave his expert opinion that Roman was not

capable of carrying on a conversation in English.

The jury found Roman guilty on all counts, and he was sentenced as described above.

## II.  DISCUSSION

On appeal, Roman challenges, *inter alia*, (1) the general sufficiency of the evidence to convict him, (2) the manner of submission to the jury of the elements of the CCE charge and the sufficiency of the evidence to support that charge, (3) the trial court's instructions to the jury, and (4) the court's failure to combine his distribution and conspiracy convictions with his CCE conviction.  We have considered all of his contentions on appeal and find merit only in the contention that the conspiracy and CCE convictions should have been combined.

### A.  *The General Sufficiency of the Evidence*

■ Roman's general challenge to the sufficiency of the evidence focuses on the testimony of Carter.  He contends that (1) Carter's testimony as a whole was unworthy of belief because it was largely uncorroborated, and (2) her testimony as to her conversations directly with Roman was incredible because Carter did not speak Spanish and Roman neither spoke nor understood English.  Neither contention has merit.

In challenging the sufficiency of the evidence on appeal, a defendant bears a heavy burden.  *United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985).  We must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and decide whether " 'the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt,' " *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986) (quoting *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983)); *see Jackson*

*v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  In making this determination, we will not disturb the jury's findings with respect to the witnesses' credibility, *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986), for as we have said, the proper place for a challenge to a witness's credibility is "in cross-examination and in subsequent argument to the jury, not in an appellate brief."  *United States v. Friedman*, 854 F.2d 535, 558 (2d Cir.1988).

Roman's argument that Carter's testimony was insufficient because it was uncorroborated is doubly flawed.  First, though only Carter was able to testify to the substance of her conversations with the narcotics dealers, there was ample evidence that conversations had occurred and narcotics had been sold.  Thus, surveillance agents testified to their observations of her encounters with Roman and his codefendants, and photographs and a videotape made by Task Force members showed Carter in the E. 106th area with Roman and others.  Finally, bundles of heroin purchased by Carter were admitted in evidence.  Thus there was circumstantial corroboration for Carter's testimony that she had conversations with Roman leading to her purchases of heroin.

Second, any lack of corroboration goes only to the weight of the evidence, not to its sufficiency.  The weight is a matter for argument to the jury, not a ground for reversal on appeal.  *See Compton v. Luckenbach Overseas Corp.*, 425 F.2d 1130, 1132 & n. 2 (2d Cir.), *cert. denied*, 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970).  The testimony of Carter and the surveillance agents, the photographic proof showing Carter with Roman, and the heroin itself, plainly provided sufficient evidence from which a rational juror could conclude beyond a reasonable doubt that Roman was guilty of distributing and conspiring to distribute heroin.

■ Similarly, the decision whether or not to credit Carter's testimony with regard to her conversations with Roman, in

light of the fact that she spoke no Spanish, was a matter entirely within the province of the jury. Carter explained at trial that her conversations in English with Roman were limited to narcotics matters. The proposition that Roman spoke some English was not inherently implausible, and indeed Roman himself provided corroboration for that proposition at trial. Although he testified through an interpreter, on one occasion he interrupted the interpreter to correct her translation, resulting in her changing the phrase "gas station" to "mechanic's shop"; and on another occasion, when the translation indicated that Roman played pool at the club, Roman added, in English, "a couple of times." Accordingly, the jury was easily entitled to infer that with respect to such matters as drug prices and quantities, Roman was capable of conversing in English well enough to communicate with Carter.

## B. The Continuing Criminal Enterprise Conviction

In order to prove a person guilty of a continuing criminal enterprise offense under 21 U.S.C. § 848, the government must prove, *inter alia*, that he has committed a felony violation under 21 U.S.C. §§ 801–970 as part of a continuing series of violations under one or more of those sections

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(d). Roman challenges his CCE conviction principally on the grounds (1) that there was insufficient evidence to establish that he acted in concert with and supervised at least five other persons and derived substantial income from the enterprise, and (2) that the manner in which the case was submitted to the jury makes it impossible to know which five individuals the jury found to be his underlings. He also contends that his sentence on this count should have been combined with his

sentences on the conspiracy and substantive counts of which he was convicted.

### 1. The Evidence and Verdict as to Five Supervisees

We turn first to the interrelated questions of whether there was sufficient proof that Roman acted in concert with five persons whom he managed or supervised in the narcotics operation, and whether the manner in which the case was submitted to the jury permits us adequately to review the jury's verdict on this issue.

In its summation, the government argued that the evidence showed eight persons who acted with and were supervised by Roman. In its instructions, the court merely told the jury that it must "unanimously agree on the identity of at least five persons with whom the defendant acted," and that those five need not be among the persons mentioned in the superseding indictment. Since the jury returned a general verdict without answering special interrogatories, this Court has no way of determining which persons were viewed by the jury as Roman's underlings. Roman contends that the lack of specificity in the verdict is ground for reversal of his CCE conviction because the jury may have counted among the required five persons a person as to whom the evidence was insufficient. We disagree that the form of the verdict and the manner in which the case was submitted to the jury require a reversal in this case.

In general, it is the defendant's responsibility to take steps to see that the arguments he would make in the appellate court are adequately preserved at trial. Where the defendant believes that certain alternative bases on which the jury might rely are impermissible because of an insufficiency of evidence, he "must request the trial judge not to submit the invalid basis to the jury or else the objection will be deemed waived." *United States v. Washington*, 861 F.2d 350, 352 (2d Cir.1988). With respect to a charge of continuing criminal enterprise, we have indicated that it is incumbent on the defendant to request an instruction that the jury is not to consider those persons as to whom he regards the

evidence of supervision as insufficient, *see United States v. Wilkinson*, 754 F.2d 1427, 1432 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985), or at the very least to make an explicit objection to the trial court's instructing the jury that it may consider such persons, *see id.; United States v. Stratton*, 779 F.2d at 827.

As an alternative, the defendant may preserve his claim that certain bases are impermissible by requesting that the jury be given interrogatories that will require it to identify the basis for its verdict if that verdict is one of guilt. Although as a general matter special interrogatories to juries in criminal cases are disfavored, *see generally United States v. Coonan*, 839 F.2d 886, 891 (2d Cir.1988); *United States v. Ruggiero*, 726 F.2d 913, 926–27 (2d Cir.) (Newman, *J.*, concurring in part and dissenting in part), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), we have indicated that where the offense charged requires proof of a specific number of predicate facts and the nature of the proof at trial warrants it, the trial court would be well advised to submit to the jury interrogatories that would allow an assessment of whether the jury's determination of guilt rested on permissible bases. *See, e.g., United States v. Ruggiero*, 726 F.2d at 922–23.

In the present case, Roman followed none of these routes to preservation of the present issue for review. He neither objected to the CCE portion of the district court's instruction nor requested that the jury be given a special interrogatory requiring identification of the five persons on whom it agreed. Nor did he request an instruction that would have limited the jury's consideration to specified individuals as to whom he did not contend the evidence was insufficient. We conclude that he has waived his right to challenge the manner in which the case was submitted to the jury. In these circumstances, his contention that the evidence was insufficient to show that he supervised at least five persons must be rejected if the evidence was sufficient as to any five of the persons as to whom proof was adduced at trial.

In assessing the sufficiency of the evidence to support the verdict that Roman supervised or managed at least five others, we note that generally a management or supervisory relationship within the meaning of § 848 is "created when one person gives orders or directions to another person who carries them out." *United States v. Stratton*, 779 F.2d at 827. The defendant on a CCE charge need not "have been the *dominant* organizer or manager as long as she was in a managerial position with respect to five other persons," *United States v. Wilkinson*, 754 F.2d at 1431 (emphasis in original); nor does the statute require proof that there was "personal contact between the leader and each underling," *United States v. Cruz*, 785 F.2d 399, 407 (2d Cir.1986), or that all of the claimed relationships were of the same type or existed at the same moment in time, *United States v. Mannino*, 635 F.2d 110, 116–17 (2d Cir.1980). Thus, the requisite associations and relationships may be found even in loosely structured enterprises. Finally, we note also that in any review of the record for sufficiency, " 'pieces of evidence must be viewed not in isolation but in conjunction.' " *United States v. Brown*, 776 F.2d 397, 403 (2d Cir.1985) (quoting *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986).

In the present case, the eight persons whom the government argued to the jury were supervised by Roman were Roig, Martinez, Red T, Ace, Delestre, Rivera, Navedo, and Mangual. In addition, the government argues on appeal that though Fernandez was not mentioned in its summation, the jury was entitled to find that Roman supervised him as well. We conclude that, viewing the record in the light most favorable to the government, the evidence was sufficient to permit the jury to infer that Roman acted in concert with virtually all of these men and was their supervisor. The evidence included the following.

There was ample proof that Roman directed Roig in the heroin-distribution operation. He repeatedly summoned Roig to do the deals with Carter or referred Carter to Roig for negotiations. That Roman was Roig's superior was plain from, *inter alia*, the events of February 27, when Roig was unable to grant Carter the discount she sought until Roman gave his approval. In addition, the men directed by Roig could properly be deemed to be under Roman's management. For example, after Roman agreed to sell Carter the first two bundles of heroin, he summoned Roig; Roig then directed Martinez to deliver these two bundles to Camacho and receive payment for them. The jury was entitled to find that Martinez was indirectly supervised by Roman. Further, in the March 19, 1986 transaction, Roman dealt directly with both Roig and Martinez. Roig had the role of treasurer, entering the club to count the purchase money; Martinez remained outside and eventually warned those who had gone to the restaurant that the police had arrived.

Though Roig obviously was Roman's principal sales representative, several others participated in sales that the jury could infer were sales for Roman. Red T sold Carter two bundles of heroin; the price was the same as that negotiated by Roman, and Camacho told Carter, in Red T's presence, that Red T was selling Roman's product. Navedo, on another occasion, told Carter she would be able to make her purchase notwithstanding Roig's absence because they all "work[ed] for" Roman. Navedo proceeded to assist Rivera to resist Carter's request for a larger discount than $10 per bundle, telling her that even their regular buyer from Connecticut paid $240 per bundle for 100 bundles. Rivera, who participated in this and other sales, plainly was a member of the organization, as he ascertained the availability of the quantity Carter desired and communicated the price, which was the same price given Carter by Roman. In connection with the December 4 sale, Rivera, Ace, and Navedo conferred with Roman prior to the actual delivery of the heroin to Carter.

Ace performed a variety of jobs for the Roman organization, including testing samples for Roman each day and acting as a lookout. Ace and Rivera also made a sale to Carter for Roman on November 19, 1985, when Roman was reluctant to deal with her directly for fear that she might be an undercover law enforcement agent. Though Roman argues that his reluctance to deal on November 19 showed that he was not involved, the record indicates otherwise, for when Carter later complained to Roman that the quantity she had received on that occasion was one bag short, Roman did not disavow involvement but rather referred her to Roig, who clearly was his major sales assistant. Thus, Roman's own action confirmed that the sale Ace and Rivera made on November 19 was, as Ace had said, "for" Roman.

The organization also obviously used two delivery men in addition to Martinez and Rivera. Fernandez, in Roman's presence, told Carter on March 19 that he would deliver the heroin she had just bought through Roig, *i.e.*, the heroin whose price Roman had just authorized Roig to discount. The nature and timing of the acts of Mangual, observed by Task Force agents, also permitted the jury to infer that he was a courier or warehouseman for the organization. He carried various bags into and out of the E. 106th area, and twice when Carter had been told to wait after agreeing to a purchase, Mangual's subsequent arrival at E. 106th was followed closely by an announcement to Carter that her heroin had arrived. On the final day of the surveillance, Mangual was observed with Roman, perusing a notebook; and a short time later, Mangual was arrested with notebooks and 2,375 bags of heroin in his possession. Plainly the evidence was sufficient to support a finding that Mangual was a participant in Roman's organization, and the jury was free to infer that Mangual the courier was subordinate to Roman the decisionmaker.

The weakest proof in the case related to the role of Delestre, who once sold Carter two bundles of heroin in the absence of Roman and Roig. We think the evidence sufficient to support an inference that De-

lestre was part of Roman's organization, since the sale was made at the price previously set by Roman, and the person who fetched and delivered the heroin for Delestre was Martinez, who clearly was an integral part of Roman's organization. Though there was no direct evidence of Delestre's rank in the organization relative to that of Roman, the jury might reasonably infer in part from Navedo's statement that "all" members of the organization worked "for" Roman, that Delestre too was managed by Roman. Nonetheless, we need not reach the question of the sufficiency of the evidence that Roman managed or supervised Delestre, since we think it plain that the evidence was sufficient to support a finding by the jury that Roman managed or supervised eight others.

### 2. *The Evidence of Substantial Income to Roman*

Roman's contention that the evidence was insufficient to support a finding that he gained substantial income from unlawful narcotics transactions need not detain us long. Section 848 was "added in 1970 in order to provide severe penalties for kingpins in the drug trade," *United States v. Ayala,* 769 F.2d 98, 102 (2d Cir.1985) (citing H.Rep. No. 1444, 91st Cong., 2d Sess. 10, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4566, 4575–76), and its requirement that the defendant's gain from such a series of transactions be "substantial" is designed to "exclude trivial amounts derived from occasional drug sales," *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). The statute does not, however, set a minimum amount necessary to show "substantial" income. Nor does it state that the jury's focus must be on the defendant's net profit from the operation rather than on the gross amounts of income received.

■ In determining whether the defendant's income has been substantial, the jury is entitled to consider both direct evidence of a defendant's wealth, *see id.,* and circumstantial evidence, such as a defen-

dant's position as the head of a large hierarchical drug operation, *see United States v. Ayala,* 769 F.2d at 102–03; *see also United States v. Sisca,* 503 F.2d 1337, 1346 (2d Cir.) (substantiality shown by "enormous quantity of narcotics involved" and "substantial sums of money changing hands"), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). Moneys received by the defendant's underlings may be considered constructively received by the defendant, and the jury is entitled to consider the gross amount received, notwithstanding the defendant's argument that some portion of his gross income must be paid out to others. *See generally United States v. Ayala,* 769 F.2d at 101–03.

■ There was ample evidence here from which the jury could conclude that Roman's gross income from his narcotics business was substantial. The evidence from which it could draw this inference included (a) the size of Roman's organization, which comprised, as discussed above, at least nine men; (b) the volume of sales made to Carter alone, which totaled more than $25,000 in five months; (c) coconspirator statements indicating that the organization made substantial other sales, including regular sales of $24,000 worth of heroin to a single customer from Connecticut; and (d) Roman's having nearly $2,500 in cash in his pocket when he was arrested. Though Roman suggests that other inferences could have been drawn regarding various pieces of this evidence, the jury was entitled to infer from the record as a whole that Roman's income from narcotics dealing was substantial.

### 3. *Combining the CCE Conviction with Other Counts*

Roman contends that his convictions on the conspiracy and distributions counts (counts 1 and 3–8) must be combined with his conviction on the CCE count (count 2), because the former offenses are included within the latter. The government concedes that the conspiracy conviction should be combined with the CCE conviction, but disputes Roman's contention with respect to the distribution convictions. We agree

that the convictions on counts 1 and 2 should be combined.

■ We have ruled that conspiracy in violation of 21 U.S.C. § 846 constitutes a lesser included offense of a CCE charge, and thus, a conviction for § 846 conspiracy should be "combined" with a CCE conviction. *United States v. Osorio Estrada,* 751 F.2d 128, 134–35 (2d Cir.1984), *cert. denied,* 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed. 2d 79 (1985). With respect to substantive narcotics violations, however, we have held otherwise, ruling that "the cumulative sentences under the substantive counts must survive." *United States v. Wilkinson,* 754 F.2d at 1432. Accordingly, the judgment with respect to counts 3–8 was proper, but we remand to the district court for correction of the judgment to combine the convictions on counts 1 and 2.

### C. *The Challenges to the Jury Instructions*

Roman makes two challenges to the trial court's charge to the jury, contending that one instruction he requested should have been given and that an *Allen* charge, *see Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), delivered by the court should not have been given. We find no merit in either contention.

#### 1. *The Requested Equal–Inference Instruction*

■ Roman asked the trial court to instruct the jury that

if they can draw two or more inferences from the same testimony of a witness with regard to facts stated by that witness, and that one is consistent with guilt and one ... not consistent with guilt, they must accept and draw the inference of lack of guilt from those facts.

The refusal to give this charge was not error, for this instruction would improperly have required the jury to consider the testimony of each witness in isolation. Plainly the jury is entitled to consider the evidence in its entirety and to evaluate whether the testimony of a given witness is plausible in light of other evidence in the record. *See, e.g.,* 1 L. Sand, J. Siffert, W. Loughlin & S.

Reiss, *Modern Federal Jury Instructions* ¶ 5.01, at 5–8 (1988) ("important to emphasize that the defendant's guilt be determined on the basis of 'all of the evidence in the case' ").

#### 2. *The* Allen *Charge*

■ The jury began its deliberations late on Thursday, April 28, 1988. On Saturday afternoon, the jury sent the following note to the court:

[W]e feel we have discussed the relevant issues thoroughly and are having a problem coming to any unanimous agreement. Can you give us some advice?

After consultation, the court and counsel for the parties agreed that it was too early in the deliberations for an actual *Allen* charge urging the jury to attempt to reach a verdict, *see Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154. Accordingly, though indicating that a full *Allen* charge might eventually become necessary, the court responded to this first note by giving what it called a "modified" *Allen* charge, simply rereading the portion of the charge that explained the rules for deliberation and reminding the jury to consider each count separately.

On Monday evening, the jury sent the court another note. It stated that

since late Friday, no one's position has changed. Each juror has had his say, and each has made his position clear. Despite having discussed the evidence in depth, and having reheard important testimony, no one's position has been shaken. We can't come to any unanimous decision. What's next?

After receiving this note, the court concluded that an *Allen* charge was called for, and it submitted a proposed instruction to counsel. On Tuesday, with Roman not objecting either to the giving of the charge or to its language, the court instructed the jury, in pertinent part, as follows:

It is desirable if a verdict can be reached, but your verdict must reflect the conscientious judgment of each juror, and under no circumstance must any juror yield his or her conscientious judgment.

. . . .

. . . [N]o juror must vote for any verdict unless, after full discussion, consideration of the issues and exchanging of views, it does represent his or her considered judgment.

The court followed by reading language from *Allen* and sent the jury back for more deliberations. Some three hours later, the jury returned its verdict, convicting Roman on all counts submitted to it.

Roman contends that he is entitled to a new trial on the ground that the court's full *Allen* charge improperly coerced the jurors into reaching a guilty verdict. We reject this contention. Since Roman failed to object to the charge, it is ground for reversal only if it constituted "[p]lain error[ ]," Fed.R.Crim.P. 52(b), and we find no plain error here.

This Circuit has viewed "[t]he propriety of an *Allen*-type charge [as] depend[ing] on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir.1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). And though we have recognized that "the chances of coercion may increase with each successive appeal by the court to the jurors to try to reach a verdict," we have been "unwilling to hold that a second *Allen*-type charge is error *per se*." *Id.*

In the present case, the substance of the *Allen* charge read in response to the jury's second note was entirely proper. Further, this was the first real *Allen* charge, since the court's response to the jury's prior note was merely a clarification of the jurors' individual responsibilities without an exhortation that they reach a decision. Given the fact that even a second charge imploring a decision would not be *per se* error, we hold that the court's delivery of this correct and unobjected-to *Allen* charge cannot be deemed plain error.

## CONCLUSION

We have considered all of Roman's arguments on appeal and, except to the extent indicated above, conclude that they are without merit and do not require discussion. The judgment is vacated in part and remanded for entry of a new judgment combining the convictions on counts 1 and 2; in all other respects, the judgment of conviction is affirmed.