**UNITED STATES of America, Appellee,**

v.

**PUZZO, et al., Defendants,**

**Joseph Paci, Defendant–Appellant.**

**No. 921, Docket 89–1475.**

United States Court of Appeals,
Second Circuit.

Argued March 14, 1990.

Decided April 1, 1991.

Hal Meyerson, New York City (Meyerson & Ramos, New York City, of counsel), for defendant-appellant.

Jacques Semmelman, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Matthew E. Fishbein, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before KEARSE, CARDAMONE and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendant-appellant Joseph Paci appeals from a judgment of conviction entered on September 26, 1989 after a jury trial before Eugene H. Nickerson, *Judge*, in the United States District Court for the Eastern District of New York. Paci was convicted on both counts of a two count indictment charging both Paci and his codefendant, Salvatore Puzzo,[1] with conspiracy to import, distribute, and possess with intent to distribute heroin in violation of 21 U.S.C. §§ 846 and 963 (1988), and possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1988) and 18 U.S.C. § 2 (1988).

On appeal, Paci challenges the sufficiency of the evidence to support his convictions. He also contends that the district court improperly restricted his direct testimony, thus prejudicially interfering with his ability to present a defense.

For the reasons that follow, we affirm the judgment of conviction.

## Background

This case arose out of a Drug Enforcement Administration ("DEA") investigation into allegations that an organization was importing heroin from Italy into the United States with the assistance of one or more corrupt United States customs officials at John F. Kennedy International Airport. Taken in the light most favorable to the government, and construing all permissible inferences in its favor, *see United States v. Diaz*, 878 F.2d 608, 610 (2d Cir.) (citing *United States v. Chang An-Lo*, 851 F.2d 547, 554 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *United States v. Grubczak*, 793 F.2d 458, 463 (2d Cir.1986); *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987), 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988)), *cert. denied*, — U.S. —, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989), the evidence at trial established the following.

---

1. Puzzo subsequently pled guilty to conspiracy to possess heroin with intent to distribute and remained free on bail pending sentence. The government's brief advises that hours after the jury found Paci guilty, Puzzo was murdered.

Commencing in October 1985, Special Agent Nicholas Alleva of the DEA participated in an investigation into the activities of Joseph Paci and others. Working undercover, with the assumed name Antonio ("Nino") Alfieri, Alleva posed as a large scale narcotics trafficker. With the assistance of an informant, Nick Argano, he arranged to travel to Italy and meet with several individuals, including Joseph Paci, in order to buy heroin.

Alleva first traveled to Italy on October 27, 1985. Following Argano's instructions, he remained in Italy until November 7, 1985 "awaiting a phone call or directions from ... Paci," which never came. Upon his return to the United States, Alleva contacted the informant and then telephoned a hotel in Naples and spoke to Paci. It became apparent that there had been a mix-up in communications, and a second trip was planned.

On November 12, 1985, Alleva again traveled to Italy. He carried $40,000 in DEA funds to use as a partial payment for the purchase of a kilogram of heroin. The total purchase price agreed to by Alleva and Paci was $90,000. On November 13, Alleva met with Paci at the Excelsior Hotel in Naples. Paci advised Alleva that the "package" was ready and would be delivered to Paci by two Italian men.

After Paci told Alleva to change his travel arrangements so they could leave Italy together the following morning, Alleva, Paci, and the two men went together by car to a travel agency. When they arrived, Paci told Alleva to give the $40,000 to one of the Italian men, who remained in the car while the others went into the travel agency. After the travel arrangements were made, the other Italian man told Paci that the package would be delivered to Paci's hotel room by 11:00 that night, or, at the latest, by early the following morning. Later, Alleva and Paci had dinner in a restaurant in Naples. During dinner, Alleva expressed concern about the package, and Paci replied that since he was being paid, he would do the worrying.

Alleva was awakened at 6:00 a.m. the following morning by a telephone call from Paci, who advised him that everything was ready. Asked whether he had the package, Paci responded: "[E]verything is okay, let's me[e]t at the airport." Paci then "expressed his desire [that Alleva and Paci] leave separately and not speak to each other." At the Naples airport, Alleva tried to engage Paci in conversation, but Paci refused to speak with him, except to repeat "everything is okay." In the Rome Airport, after the initial leg of the journey, Paci again refused to converse with Alleva. Alleva and Paci sat apart from each other on the flight from Rome to New York. Finally, upon arriving at Kennedy Airport, they remained separate, again per Paci's instruction.

Acting upon information supplied by the informant Argano on the day following Alleva's return from Italy, Alleva collected an additional $10,000 in DEA funds to take to Paci's home at 2170 79th Street, Brooklyn. The additional cash apparently was needed so that an unidentified Kennedy Airport employee would release the package of heroin from his custody. On November 18, Alleva, accompanied by Argano, brought the money to Paci's home. Paci was not there. Instead, they were met by Puzzo, who was introduced to Alleva by Argano. Puzzo directed Alleva to place the $10,000 under a sofa cushion. Puzzo told Argano that Paci was not home but would return shortly, and instructed Argano to call Paci the following morning.

Alleva returned to Paci's residence on November 27, 1985. Based upon information provided by Argano, Alleva expected to receive one-eighth of the kilogram of heroin that Paci had smuggled in from Italy. Alleva understood from Argano that after the balance had been sold by Paci and Puzzo, Alleva would receive a portion of the proceeds. As Alleva approached Paci's residence, Paci came outside to meet him and said: "I have something for you." Paci opened the trunk of a red Oldsmobile and removed a brown paper bag, which he placed in Alleva's attache case. When Alleva apologized for not trusting Paci and having questioned whether he had the package, Paci responded: "I could not tell

you I had the package." Alleva left after agreeing to contact Paci "to let him know the quality of the merchandise."

Inside the brown paper bag was a transparent bag that contained white powder. Alleva did not conduct a field test, but submitted the package to the DEA laboratory for testing. The laboratory analysis revealed that the package contained not heroin, but Diazepam (valium). After receiving the report from the laboratory, Alleva met with Paci on December 6, 1985 at a diner in Brooklyn. The informant Argano was also present. Alleva expressed his dissatisfaction with the package, stating that "it was not what it was supposed to be."

Paci insisted that he did not know what had happened, that he had received the package directly from the two men in Naples, and "they had told him it was good." Upon further complaint from Alleva, Paci acknowledged that the two men had told him that the package contained only 600 grams rather than a full kilogram, and that Alleva would receive the remaining 400 grams upon paying the full purchase price. When Alleva suggested that Paci had done something wrong at the airport, Paci stated that "that was totally out of the question, he [Paci] had possession of the package," and had dealt only with confederates in customs who were totally reliable "to bring the package in." The conversation ended when Alleva refused Paci's suggestion that he purchase an additional half kilogram of better quality heroin from the two Italian men for $20,000. Later that month, Alleva was transferred by the DEA to a different assignment, as a result of which he played no further role in this investigation.

Detective Richard Platzer resumed the investigation approximately six months later. He assumed the undercover role of a narcotics trafficker, using the name "Rich Pizzo." Platzer went with Argano to Puzzo's residence in Brooklyn on June 17, 1986. Argano introduced Platzer as an associate of "Nino," the nickname used by Alleva in his undercover role. Platzer told Puzzo that "Nino" was no longer involved, that the money provided for the defective

package Alleva had received from Paci was Platzer's, and that Platzer was therefore owed the $50,000 he had paid plus an additional $10,000 for expenses. Puzzo told Platzer to be patient, and indicated that based on two telephone calls he had placed to Italy, he was expecting "a package to come in."

On September 25, 1986, Platzer and Argano met with Puzzo at Puzzo's residence in Brooklyn. The three then drove to a nearby intersection, where Puzzo and Argano left the car and disappeared from Platzer's view. They returned after a short period, and Puzzo handed Platzer a plastic bag containing white powder, which subsequent laboratory analysis revealed to be 265.1 grams of heroin. Puzzo stated: "[T]his takes care of part of the problem." Platzer responded: "yes, now we can start making money."

Puzzo agreed to notify Platzer when he had more heroin available. Although Platzer regarded the $50,000 debt resulting from the prior valium delivery as discharged, he told Puzzo that an additional $10,000 was still owed to cover the expenses of Alleva's trip to Italy.

On October 8, 1986, Platzer gave $5,000 to Puzzo, who was to secure five ounces of heroin for Platzer. Unable to do so that day, Puzzo stated that he would contact Platzer shortly to complete the transaction. Six days later, Platzer met with Puzzo, accompanied by Argano, in Brooklyn. Puzzo stated that he still had not been able to obtain the five ounces, but that he had 400 grams of low grade heroin that he would sell to Platzer for $2,500 an ounce. Platzer indicated he would forgive the $10,000 debt from the valium incident in exchange for 120 grams of the low grade heroin.

Two days later, Platzer and Argano met Puzzo at Puzzo's residence in Brooklyn, where Puzzo gave Platzer a package containing a clear plastic bag of white powder. Subsequent laboratory analysis revealed the powder to be 114.4 grams of heroin.

On December 8, 1986, Platzer and Argano again met with Puzzo in Brooklyn. Puzzo advised Platzer that there was no good heroin available "on the street," and that

two kilograms were available in Italy. It was then agreed that Platzer would make the trip during the first week of January. Platzer asked whether Puzzo or Paci would be accompanying him to Italy. Puzzo responded that he did not trust Paci. Two days later, Puzzo advised Platzer "that he had talked to the people at the airport and that everything was being arranged," and they could make the trip to Italy during the first week in January.

On December 29, 1986, Platzer and Argano again met with Puzzo to make plans for the trip to Italy. Puzzo informed Platzer that because of preparations that had to be made at the airport, the trip would have to be made in the middle, rather than the beginning, of January. Puzzo then stated that Paci would be making the trip with Platzer, and that Paci would be paid for doing so. Platzer responded: "isn't this the same Joe Paci that you told me you didn't trust[?]" Puzzo assured Platzer that Paci was "okay," and further explained that "the people in the airport know Joe Paci and Joe Paci has been smuggling in stuff at the airport for years."

There was further delay regarding the planned trip to Italy. At a meeting in Brooklyn on February 9, 1987, Puzzo reiterated that Paci would accompany Platzer, and proposed that upon boarding the plane to return from Italy, Platzer would hand the package of heroin to Paci, who in turn would take it through customs. Platzer responded that the plan was unacceptable "because of the problems the last time." Puzzo then suggested that Platzer keep the heroin and give it to the customs agent, whom Paci knew and would point out.

Platzer, Argano, and Puzzo again met in Brooklyn on February 13, 1987, and drove to Jay Stylist, a beauty parlor in Brooklyn that was Paci's place of employment. Paci joined them in the car, and Puzzo introduced him to Platzer. Puzzo asked Paci when he wanted to go to Italy. Paci stated that he would be unable to go the next week because he was going to Florida, but the following week would be acceptable.

Three days later, Platzer and Argano met with Paci at Paci's residence in Brook-

lyn. Paci informed Platzer that he had learned from Puzzo that there would be no customs agent to assist them in bringing in the package, and that Paci would have to bring in the package unaided. Paci explained that when Puzzo had brought in a package the previous May, he "stiffed the guy at the airport and didn't pay him," and that as a result the inspector was refusing to work with Puzzo. Paci told Platzer that he would bring the package into the country taped to his legs. When Platzer expressed reluctance to proceed without the assistance of the customs inspector, Paci stated that he had "done it on prior occasions." He then specified that on "the trip he made with Nino [Alleva], ... when he [Paci] brought the stuff in, he had it taped to his legs and he came through Customs."

Platzer would not agree to the new plan, stating: "I don't think this trip is going to go unless I know 100 percent that the—it is guaranteed that it's going to get in." Paci stated that he would discuss the matter with Puzzo's friend "Paolo," the man who had the connections at the airport. Paci explained: "[T]hey know me because I have been doing this but I can't go to them without first going to [Puzzo] and Paolo."

In the course of this conversation, Platzer asked Paci about the prior trip from Italy when Paci had been accompanied by Alleva. Platzer testified concerning that portion of their conversation as follows:

I had Joe [Paci] explain to me how the whole trip was done with Nick, Agent Alleva. I asked him, when you and Nino went to Italy, I said what happened? How did this happen? And he said to me he doesn't know that, all he knows he brought what he thought to be good stuff back and he turned it over to Sal [Puzzo] and he didn't know what happened.

And I said, because it doesn't make sense to me that—he said Richie what do you want me to tell you, I put it on my body, I brought it in and they told me it was good over there. I believed them and I gave it over to Sal.

On February 24, 1987, Puzzo told Platzer that Platzer would be able to make the trip

to Italy unaccompanied. Puzzo stated that the customs inspector wanted $50,000 to allow the package to pass through customs, and that Platzer could bring in up to six kilograms of heroin. The following day, Puzzo informed Platzer that Paci "was no longer involved in this." Shortly thereafter, as a result of an unrelated investigation, federal agents arrested a number of Pan Am employees. Puzzo told Platzer that one of those arrested was "one of his people," and that the trip to Italy would have to be postponed, because "it would take a few months for things to cool down." Although Platzer and Puzzo had at least one subsequent meeting, Platzer never made the trip to Italy.

## Discussion

### A. *Sufficiency of the Evidence.*

At trial, Paci twice moved pursuant to Fed.R.Crim.P. 29 for a judgment of acquittal; first, at the close of the government's case, and again after both sides rested. He argued that the evidence was insufficient to sustain a conviction on either count of the indictment. The motions were denied. On appeal, Paci renews this contention.

An appellant challenging the sufficiency of the evidence bears " ' " "a very heavy burden." ' " *United States v. Nusraty,* 867 F.2d 759, 762 (2d Cir.1989) (quoting *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984) (quoting *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983)), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985)); *see United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986); *United States v. Grubczak,* 793 F.2d 458, 462–63 (2d Cir. 1986). In reviewing such claims, we "view the evidence in the light most favorable to the government and construe all possible inferences in its favor." *United States v. Badalamenti,* 794 F.2d 821, 828 (2d Cir. 1986) (citing *United States v. Martino,* 759 F.2d 998, 1002 (2d Cir.1985)); *see United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989).

"If '*any* rational trier of fact could have found the essential elements of the crime,' the conviction must stand." *Badalamenti,* 794 F.2d at 828 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in *Jackson* )). "The test is 'whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt.' " *United States v. Chang An–Lo,* 851 F.2d 547, 554 (2d Cir.) (quoting *Grubczak,* 793 F.2d at 463), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). The government is not required "to preclude every reasonable hypothesis which is consistent with innocence." *Chang An–Lo,* 851 F.2d at 554 (citing *United States v. Fiore,* 821 F.2d 127, 128 (2d Cir.1987)). In sum, "[a] jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Nersesian,* 824 F.2d 1294, 1324 (2d Cir.1987) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987), 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988).

We consider first the conspiracy charged in count 1. Paci was shown to be involved with Puzzo, the two men in Italy, and a corrupt customs inspector. Statements made by Paci to both Alleva and Platzer, according to them, clearly indicated that Paci had knowingly brought a substance that he thought to be heroin into the United States for the purpose of distribution. Platzer also testified that Paci admitted to him Paci's ongoing involvement with Puzzo in the importation of heroin. Although Paci denied these admissions when he testified at trial, and suggests on appeal that Puzzo perpetrated a "scam" against Alleva in which Paci was an unknowing participant, there was clearly adequate evidence to support the jury's verdict. The testimony of Alleva and Platzer, if believed, amply supported the conviction, and Paci's "scam" scenario is hardly plausible in the context of the overall evidence.

In any event, the issue of credibility was the jury's to decide. *See Roman*, 870 F.2d at 71.

■ The evidence on count two, which charged Paci and Puzzo with possession of heroin, was also sufficient to sustain a conviction. The charge in this count was based upon Puzzo's September 25, 1986 delivery of heroin to Platzer. Alleva had previously provided a total of $50,000 to Paci and the Italians in Naples for the purpose of buying heroin, but the package delivered to Alleva turned out to contain valium instead of heroin. On September 25, Puzzo handed Platzer a package of heroin. Puzzo sought no payment from Platzer, but instead stated: "[T]his takes care of part of the problem."

The government's theory, on appeal as at trial, "is that Puzzo delivered the heroin on Paci's behalf to satisfy Paci's debt to the undercover agent. Puzzo and Paci thus jointly possessed the heroin." In denying Paci's Rule 29 motion, the trial court acknowledged this theory, stating: "There is enough evidence Mr. Puzzo wasn't delivering [the heroin] on his on [sic] behalf but also on the behalf of Mr. Paci."

Possession of narcotics "may be shared among several conspirators, each of whom performs a distinct role in the transaction." *United States v. Davis*, 679 F.2d 845, 853 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983); *see also United States v. Torres*, 901 F.2d 205, 221 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). The jury was entitled to conclude, based upon the evidence presented, that the heroin was possessed by Puzzo not only on his own behalf, but for the benefit of Paci, as well. The evidence was sufficient to establish that Puzzo and Paci had collaborated on the original importation, Paci had delivered the bogus heroin to Alleva, and Alleva's first complaint concerning the delivery was made to Paci. Further, Platzer's testimony indicated that both Paci and Puzzo continued to be involved in discussions with Platzer regarding the importation of heroin well past the September 25, 1986 delivery. The jury could therefore infer that when Puzzo told Platzer that the September 20 delivery took care of "part of the problem," he was acting on behalf of both himself and Paci, and that Paci had aided, abetted, counselled, commanded, induced, or procured the delivery within the meaning of 18 U.S.C. § 2 (1988). In sum, we see no reason to overturn either conviction for insufficient evidence.

### B. *Restriction of Paci's Testimony.*

After calling two character witnesses, Paci took the stand in his defense. At several points during his direct testimony, the court sustained objections of opposing counsel to questions posed by Paci's attorney, preventing Paci from describing conversations he had with Puzzo and, on one occasion, with Alleva. According to Paci, these conversations, which "were intended to constitute the crux of his defense" by explaining his presence in potentially culpable situations, were improperly restricted. Specifically, Paci points to the following testimony concerning his encounter with Alleva in Italy:

Q While you were in Sicily, you said you got a phone call from Mr. Puzzo?

A Yes.

Q Would you continue?

A Called the first time and I wasn't home; and called again and got me home. He said to me—

THE COURT: You can't say what he said. You had a conversation?

THE WITNESS: Yes.

Q What did you say to him in this conversation?

A For what he asked me, I said yes.

Q Did you say anything else to him?

A I said why would I have to go there.

Q As a result of your conversation with Mr. Puzzo you then left Naples and went—I am sorry, left Sicily and went to Naples?

A Yes.

Q As a result of your discussions, did you know why you were going to Naples?

THE COURT: No, come on.

MR. PASCARELLA [defense counsel]: May we have a sidebar?

THE COURT: No, move ahead.

\* \* \* \* \* \*

THE COURT: Why don't you pick it up when you get to Naples.

\* \* \* \* \* \*

Q When you were at the hotel [in Naples] what, if anything, happened?

A I got a phone call from Mr. Puzzo.

Q Following that phone call what, if anything, happened?

A I told Mr. Puzzo that I—

THE COURT: No, don't. What happened after that?

Q What did you tell Mr. Puzzo?

MR. SEMMELMAN [government counsel]: Objection.

THE COURT: Sustained.

MR. PASCARELLA: As to what he said?

THE COURT: Yes.

Q What happened after the phone call from Mr. Puzzo?

A I wanted to come home. Because my ticket—

MR. SEMMELMAN: Objection.

THE COURT: No.

Q What was the reason you wanted to come home?

MR. SEMMELMAN: Objection.

THE COURT: Sustained.

\* \* \* \* \* \*

Q After you got this telephone call from Mr. Puzzo, what, if anything, happened?

A After that phone call I got another phone call.

Q The person who called you, did you know the person?

A No.

Q After that phone call what happened?

A They told me not to worry about my ticket.

MR. SEMMELMAN: Objection.

THE COURT: Don't do that. Tell us what happened? You see, there are rules we have to follow. One of which is hearsay, except under certain circumstances, basically you can't say what someone else said to you. Do you understand that?

THE WITNESS: Yes.

THE COURT: What your lawyer is asking, what happened, okay. Listen to the question and just answer the question.

Q Mr. Paci, can you say what you said and what happened? But we are—

MR. SEMMELMAN: I object to this.

THE COURT: Don't instruct him. That doesn't happen to be right. Ask a question.

Q After the second phone call what happened?

\* \* \* \* \* \*

A Those two men picked me up and took me to another hotel.

Q What, if anything, happened at the other hotel, do you know?

\* \* \* \* \* \*

A I had to meet a certain person named Nino Alfieri or something like that.

Q When you got to the hotel did you meet with anybody there?

A When I got to the hotel, that was with the two gentlemen. I went to the reception area and asked for Nino. He called the number and this gentleman came down.

The gentleman came down. He had an open shirt, full of jewelry, very macho. Macho.

I didn't feel comfortable.

Q Are you able to relate this person Nino to the second phone call made to you by a person you had not known before?

MR. SEMMELMAN: Objection.

THE COURT: Sustained.

When I sustain an objection don't answer.

Paci also maintains that the following testimony regarding a subsequent conversation with Puzzo was improperly restricted:

Q  Now, prior to Mr. Alleva coming to your home to pick up something did you see Mr. Puzzo?

A  Yes.

Q  When was the last time you had seen him prior to Mr. Alleva coming?

A  The day before.

Q  What happened at that time?

A  The day before he came in and told me—

MR. SEMMELMAN:  Objection.

THE COURT:  Sustained.

Finally, Paci points to restrictions imposed upon his testimony regarding preparations for the visit by Puzzo and Platzer to Paci at Paci's place of employment, Jay Stylist, as follows:

A  [Puzzo] asked me if when he came around with—what is his name?  The other agent, Mr. Alleva, when Mr. Alleva's partner would come around I would say whatever [Puzzo] says I should say yes.  I asked him why.  Do you want to know why?

Q  Did you say anything in response?

A  Yes.

Q  What did you say?

A  I wanted to know why I should say yes to something.

Q  Did you then engage Mr. Puzzo in any further conversation?

A  Yes.

Q  Did he ask anything of you at that time when you asked why?

A  Yes.

MR. SEMMELMAN:  Objection.

THE COURT:  Sustained.

MR. PASCARELLA:  Not what he said.

THE COURT:  Don't put it now in the form what he said.  What question did he ask you?

THE WITNESS:  He asked me to help him out and say yes to whatever he—

THE COURT:  You already testified to that.

Paci argues that the district court's improper restriction of his testimony deprived him of the opportunity to present a defense, thereby violating his fifth amend-ment right to due process and his sixth amendment right to counsel.  The government responds that:  (1) the issue has not been preserved for appellate review because it was not raised below;  (2) viewed in the context of subsequently allowed testimony and defense counsel's summation, no significant restriction of Paci's testimony occurred;  and in any event, (3) any error was harmless.  Accordingly, we examine (1) the issue of waiver;  (2) whether Paci's testimony was erroneously circumscribed;  and (3) whether any error that occurred was in any event harmless.

1.  Waiver.

■  It is clear from the foregoing that the trial court restricted Paci's testimony to prevent the admission into evidence of hearsay.  Paci contends on appeal that the evidence as he intended to use it would not have been hearsay, or alternatively would have fallen under an exception to the hearsay rule.  The government responds, however, that Paci's trial counsel failed to present this argument to the district court and thereby waived the issue.  Thus, the government reasons, we may reverse only if plain error is established.  *See* Fed.R. Crim.P. 52(b).

Concededly, Paci's counsel waived an opening statement, thereby precluding any initial insight into the theory of Paci's defense.  On the other hand, Paci's counsel requested a sidebar conference when the trial court originally ruled adversely regarding Paci's testimony, and was rebuffed.  *See United States v. Pugliese,* 712 F.2d 1574, 1580 (2d Cir.1983) (burden on counsel to alert court to legal basis for proffer).  Paci's counsel also persisted in his attempts to elicit the testimony in question.  We believe these efforts suffice to establish that Paci did not waive his right to argue this point on appeal.

2.  The Excluded Testimony.

■  It would appear that at least some of Paci's intended testimony concerning conversations between Paci and Puzzo, and on one occasion in Naples between Paci and Alleva, was improperly excluded.  Fed.R.

Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Paci contends that the conversations were not offered for "the truth of the matter asserted," but rather to explain Paci's state of mind. Thus, the conversations with Puzzo and Alleva while Paci was in Italy would assertedly have established that Paci had been duped by Puzzo into thinking he would be carrying back a package of gold jewelry, not cocaine. The subsequent excluded conversations concerning (1) delivery of the package and (2) a repeat trip to Italy by Paci would presumably have been along the same lines. Far from being offered for their truth, Paci contends that "the thrust of [his] testimony is that Puzzo was lying to him." Thus, the proffered testimony was assertedly admissible because it "formed the basis of Paci's knowledge at the time which provided the motive for his actions; and was evidence of Paci's probable state of mind."

Paci's proffered testimony regarding these conversations apparently was not offered for the truth of the matters asserted. *Cf. United States v. Pedroza*, 750 F.2d 187, 203 (2d Cir.1984) (statement not hearsay because offered for its "patent falsity"). Thus, the statements would not have been hearsay as offered, and the district court erred in excluding them. *See United States v. Lambinus*, 747 F.2d 592, 597 (10th Cir.1984) (testimony offered to show effect of statements on listener not hearsay), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985); *United States v. Leake*, 642 F.2d 715, 720 (4th Cir.1981) (statement offered as evidence of defendant's state of mind not hearsay); *United States v. Carter*, 491 F.2d 625, 628–29 (5th Cir.1974) (same).

This is not, however, the end of the matter. As Paci concedes, the district court relaxed its restrictions as Paci's testimony proceeded and its thrust became clearer. As Paci states in his brief:

> Eventually, the court did allow Paci to testify regarding what Puzzo asked him to do (e.g., bring gold to the United States, to introduce two individuals to a person from New York, to give a package to Agent Alleva, and to agree to go to Italy). The court did *not* allow Paci to explain the reason for these requests (e.g., why Puzzo wanted gold, who the Italians were, why he wanted Paci to make the introduction, why he wanted Paci to deliver a package, what the package allegedly contained, what the purpose of the proposed second trip to Italy was to be).

In the course of his direct examination, Paci testified that Puzzo was his good friend, his employer in the "Jay Stylist" beauty shop, and his former lover; that Puzzo discussed with Paci, prior to Paci's trip to Italy in November 1985, the idea of importing gold jewelry to sell in the beauty shop "like pawn shops;" that after this conversation, Paci went to Sicily to visit relatives, leaving with Puzzo a phone number in Italy where Paci could be contacted regarding business matters; and that Puzzo called Paci in Sicily and asked Paci to introduce two people in Italy to Puzzo's "partner from New York," *i.e.*, Alleva.

Paci's central complaint is that he was not allowed to develop the explanation that Puzzo misled him into believing that he was bringing back gold, not cocaine, from Italy. The trouble with this argument is that Paci twice testified that he refused to bring back any gold from Italy when Puzzo requested that he do so. His initial testimony in this regard was:

> Q Now, prior to you going to Sicily in November 1985, did you have any discussion with Mr. Puzzo about the business at the beauty parlor?
>
> A Yes.
>
> Q Did he ask you anything at that time, sir?
>
> A Yes.
>
> Q What did he ask you?
>
> A He asked me, he would want to bring in some gold, like pawn shops.
>
> THE COURT: What was the question he asked you?
>
> THE WITNESS: He asked me being I was in Italy that he wanted to—

THE COURT: What did he ask you?

THE WITNESS: If I would bring gold from Italy. I said no. I thought it was a small amount.

Immediately thereafter, Paci's counsel returned to the subject, eliciting the following testimony:

Q Now, back to this discussion about the beauty parlor business and the gold, he asked you to personally bring the gold back.

A Yes, I said no way.

In his summation, Paci's counsel nonetheless suggested that in light of the prior conversation with Puzzo, Paci might have surmised that Puzzo was "sending [his] partner [Alleva] over on a jewelry business deal," and later asserted "that is what Mr. Paci believed" to be the subject of the meetings in Naples. Aside from these suggestions, the central thrust of Paci's testimony, and of his counsel's summation, was that the government agents were lying about the events in question, and especially about Paci's alleged admissions to them, and that Paci knew nothing about any narcotics activity.

3. Harmless Error.

■ Although the district court erroneously cut short some questioning the responses to which would not have been hearsay, Paci was ultimately able to testify, and his counsel to argue, in support of the theory that Puzzo had misled Paci into believing that the meetings and introductions Paci undertook in Italy at Puzzo's behest were related to the importation of gold jewelry. Indeed, given Paci's repeated testimony that he had explicitly refused, prior to his trip to Italy, to bring gold jewelry back for Puzzo, his counsel's suggestions in summation probably did as much with that theory as the record would allow. Further, although we have concluded that Paci's counsel should not be charged with a waiver on this issue, we note that no offer of proof was ever made to indicate that the theory pressed by Paci on appeal was regarded as a substantial line of defense at trial.

The gist of the trial was a clash of credibility between agents Alleva and Platzer, on the one hand, and Paci, on the other. The jury obviously decided that fundamental issue against Paci. We conclude that in view of the weight of the evidence against Paci, and his subsequent opportunity to provide the substance of the challenged testimony, any error in restricting Paci's testimony regarding his conversations with Puzzo was harmless.

Conclusion

The judgment of conviction is affirmed.