**UNITED STATES of America, Plaintiff,**

v.

**Perry DeFREITAS, Defendant.**

**No. S198 CR. 1004(RWS).**

United States District Court, S.D. New York.

April 5, 2000.

Honorable Mary Jo White, United States Attorney for the Southern District of New York, New York City (Tiffany M. Erwin, Assistant U.S. Attorney, of counsel), for the United States of America.

The Legal Aid Society, Federal Defender Division, New York City (Leonard F. Joy, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Perry DeFreitas ("DeFreitas") has moved, pursuant to Rule 29(c), Fed.R.Crim.P., to set aside the guilty verdict in this action and enter a judgment of acquittal. For the reasons set forth below, the motion is denied.

### Prior Proceedings

On June 5, 1998, the Government filed its criminal complaint in this action. A two-count superseding indictment was filed on April 8, 1999, charging DeFreitas with conspiracy to knowingly traffic and attempt to traffic in counterfeit goods in violation of 18 U.S.C. § 2320(a), and with the substantive crime of trafficking in counterfeit goods, also in violation of 18 U.S.C. § 2320(a). Following a jury trial, DeFreitas was found guilty on May 28, 1999, on each count of the indictment.

On June 10, 1999, DeFreitas' application to extend the time period for filing a Rule 29(c) motion was granted.

The instant motion was filed on November 10, 1999. Additional papers were filed through December 8, 1999, at which point oral argument was heard and the motion deemed fully briefed.

## Facts

Viewed in the light most favorable to the Government, as required under a Rule 29 motion, the following facts were elicited at trial.

Ty, Inc. manufactures "Beanie Babies," small stuffed animals for which the consuming public—adults and children alike—have a seemingly voracious appetite. The popularity of Beanie Babies is enhanced by Ty, Inc.'s production and marketing strategy: only a limited number (e.g., 25,000) of each particular "style" of Beanie Baby is produced, after which the style is "retired," i.e., it is no longer produced. Beanie Babies are sold for a retail price of between $5 and $7, and are only available at certain authorized stores. Depending on the size of the store, Ty, Inc. limits the number of Beanie Babies the store can purchase at wholesale. New styles are continually introduced in the marketplace, but the retired styles have become collector's items and fetch astonishingly high prices in the secondary market. Particularly prized styles can sell for well over a thousand dollars each. Authorized stores which sell new or current styles for the suggested $5 to $7 retail price often also participate in the secondary market and sell retired styles, which they obtain from collectors and traders, at much higher prices. All Beanie Babies are currently manufactured exclusively in factories in China, although production had been split previously between China and Indonesia.

The phenomenal popularity of Beanie Babies and their value in the secondary market is complicated by the fact that all manufacturing is done in China, where counterfeiting has occurred. Counterfeit Beanie Babies can be distinguished if one knows what to look for: misinformation on the label, slightly different colors of fabric, quality of materials, and so forth. Books and other sources of information, available in hard copy and on the internet, educate collectors and traders to enable them to spot fakes. In addition, Ty, Inc. spends considerable resources policing its copyright and trademark protections in its products.

DeFreitas owned a stationery store in Ridgewood, New Jersey, called Drapkin's, which was an authorized retail seller of Beanie Babies. The items were among the most profitable goods sold by the store, and customer demand exceeded the supply which DeFreitas was able to obtain from Ty, Inc. To satisfy this high demand, DeFreitas traveled to China in November 1997, and located a vendor who sold him several thousand Beanie Babies, which DeFreitas shipped back to the United States and subsequently sold at Drapkin's. In March 1998, DeFreitas returned to China, and purchased approximately 7296 Beanie Babies in five different styles for less than $1 each at the "Russian" open market in Beijing. The Beanie Babies which DeFreitas purchased were packaged in a manner suggesting they had come directly from a factory. If genuine, each of these Beanie Babies would have sold in the secondary market in the United States for between $75 and $2,000 each. Several hundred of these Beanie Babies were in two styles that had been retired: "Liberty," retired in 1996, and "Peking," retired in 1994. DeFreitas was knowledgeable regarding the Beanie Baby secondary market and the value of the retired styles.

DeFreitas was assisted on this trip by Zhang Changzhang ("Zhang"), who functioned as an interpreter and guide. On June 2, 1998, after DeFreitas returned from the trip, Zhang sent him an e-mail message stating that although authentic Beanie Babies could not be purchased in China, Zhang could obtain high-quality copies.

DeFreitas shipped the Beanie Babies back to the United States with the intention of re-selling them. To clear the goods through Customs, he produced an invoice stating that the goods were "plush toys" manufactured by China North Industries, Shenzhen Corporation, which is not a factory authorized to make Beanie Babies. DeFreitas did not inform Customs that the

shipment contained Beanie Babies, merely that they were stuffed animals to be used for carnival purposes.

The Beanie Babies were shipped from China to Canada, then trucked to John F. Kennedy International Airport in Queens, New York, and then to a Customs-bonded warehouse in New Jersey. Between Kennedy Airport and the New Jersey warehouse the Beanie Babies passed through the Southern District of New York.

Before the March 1998 trip, DeFreitas had promised Charles Martin ("Martin"), a supplier of paper goods to Drapkin's, that Martin could purchase some of the Beanie Babies which DeFreitas would ship back. DeFreitas knew that Martin planned to resell those Beanie Babies in the secondary market. While DeFreitas was in China, Martin pre-arranged several sales in anticipation of the forthcoming shipment.

In addition to shipping the bulk of his purchases, DeFreitas carried home some samples, including an "Erin" bear Beanie Baby. The Erin samples had a ribbon around the bears' necks, an indicator of inauthenticity: genuine Erin bears were not designed and manufactured with a neck ribbon. DeFreitas suggested to Martin that they would have to cut the ribbons off the Erin bears to sell them.

On April 24, 1998, Drapkin's sold three counterfeit Erin bears for $75 each. However, the purchasers discovered that the bears were counterfeit and began returning them, demanding refunds. DeFreitas stopped selling these Beanie Babies in his store. Martin told DeFreitas he had a purchaser for the counterfeit Beanie Babies who was willing to pay five dollars each, to whom DeFreitas then sold those Beanie Babies.

Meanwhile, Zhang had informed DeFreitas that better-quality fakes were obtainable. Zhang sent samples of such fakes to DeFreitas. Believing that these better-quality counterfeits would not be so easily discovered by consumers, DeFreitas planned to arrange for further shipments and subsequent sales.

## Discussion

### I. *The Standard of Review*

The standard for review for a Rule 29(c) motion has recently been summarized by the Second Circuit:

> In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir.1991). All permissible inferences must be drawn in the government's favor. *Id.* In addition, the court must be careful to avoid usurping the role of the jury. As we noted in *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984), upon a motion for judgment of acquittal, "the Court 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *Id.* (*quoting Curley v. United States*, 160 F.2d 229, 232 (D.C.Cir.1947)). Rule 29(c) does not provide the trial court with an opportunity to "substitute its own determination of ... the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Id.* In fact, if the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Curley*, 160 F.2d at 233.

*United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999).

DeFreitas seeks acquittal on the grounds that the Government failed to prove (1) venue in the Southern District of New York, and (2) that the counterfeit merchandise bore a trademark identical to or substantially indistinguishable from a registered mark.

## II. Venue Was Properly Established With Respect to Both Counts of the Indictment

A defendant has the right to be tried in the "district wherein the crime shall have been committed." U.S. Const. art. VI; *see* Fed.R.Crim.P. 18; *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir.1989). Venue must be proper with respect to each count for which a defendant is charged. *See id.* Because venue is not an element of the offense, the Government may prove venue by a preponderance of the evidence. *See United States v. Rosa*, 17 F.3d 1531, 1541– 42 (2d Cir.1994).

In .order to determine where a crime was committed, the " 'locus delecti' [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez– Moreno*, 526 U.S. 275, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999) (*quoting United States v. Cabrales*, 524 U.S. 1, 6–7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998)). In making that determination, it is helpful to look at the " 'key verbs which define the criminal offense in the statute.' " *United States v. Brennan*, 183 F.3d 139, 145 (2d Cir.1999) (*quoting United States v. Chestnut*, 533 F.2d 40, 46–47 (2d Cir.1976)). Nevertheless, the Supreme Court has recently cautioned that analysis of "key verbs" cannot be the sole consideration when making a determination with respect to venue. *See Rodriguez–Moreno*, 526 U.S. at 280, 119 S.Ct. 1239.

Venue over a particular crime may be proper in several districts. "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the constitution does not command a single exclusive venue." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir.1985). A defendant accused of a crime may be prosecuted in any district where any part of the crime occurred. *See United States v. Chalarca*, 95 F.3d 239, 245 (2d Cir.1996); *United States*

*v. Gonzalez*, 922 F.2d 1044, 1054 (2d Cir. 1991).

### A. Venue Was Properly Laid With Respect to the Substantive Count

The Superseding Indictment in this case charged that "On or about April 27, 1998, Perry DeFreitas, the defendant, and others known and unknown caused approximately 7,296 imported, counterfeit Beanie Babies to travel along the New York Thruway through the Southern District of New York to a customs broker located in Jamaica, Queens."

It is not disputed that the Beanie Babies traveled through the Southern District on their way from China to DeFreitas in New Jersey, where they were sold. DeFreitas maintains, however, that the trip from China to New Jersey does not constitute part of the substantive offense of trafficking in counterfeit goods under 18 U.S.C. § 2320(a), either under the definition of "traffic" in § 2320(a) or by application of the general venue provision of the continuing offense statute, 18 U.S.C. § 3237.

Section 2320(a) makes it a crime to "intentionally traffic[ ] or attempt[ ] to traffic in goods or services and knowingly use[ ] a counterfeit mark on or in connection with such goods or services." Section 2320(e)(2) defines traffic: "The term 'traffic' means transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent so to transport, transfer, or dispose of."

Section 3237(a) provides:

Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may .be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an

object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

Neither DeFreitas nor the Government has cited any authority construing § 2320 in the context of a venue determination, nor has independent research by the Court revealed any such authority to guide this analysis. Nevertheless, the statutory language is plain enough on its face to dispose of DeFreitas' motion.

■ In the instant case, the substantive offense of trafficking involved the importation of objects—counterfeit Beanie Babies—into the United States and is thus a continuing offense under the second paragraph of § 3237(a). That the Government did not bring an importation charge against DeFreitas makes no difference; the essence of the activity for which DeFreitas was charged involved the importation of counterfeit Beanie Babies.

In addition, the § 2320(a) charge is a continuing offense under the first paragraph of § 3237(a), because it was committed in more than one district.

There is no dispute between the parties that venue cannot lie under the first clause of the "traffic" definition in § 2320(e)(2), because there is no evidence of any sale taking place in the Southern District of New York.

■ As for the second clause, DeFreitas contends that there was insufficient evidence presented at trial to support a finding that he intended to purchase counterfeit Beanie Babies in China and transport them back to the United States to resell. However, under the Rule 29(c) standard set forth above, sufficient circumstantial evidence was introduced at trial from which reasonable jurors could conclude that DeFreitas knew the Beanie Babies were counterfeit when he purchased them, and that he intended to purchase counter-

feit Beanie Babies, transport them back to the United States, and sell them.

■ DeFreitas also maintains that the purchase of the Beanie Babies in China does not constitute "obtain[ing] control" under 2320(a). Yet he provides no reasoning or authorities in support of this counterintuitive proposition. After DeFreitas purchased the Beanie Babies, he directed that they be shipped to him in New Jersey. While he did not, of course, have the Beanie Babies in his possession while they were being shipped, they were certainly under his control.

■ DeFreitas further maintains that the purchase and shipment of the Beanie Babies constitute preparatory acts that are not part of the substantive offense of trafficking. In support of this proposition, he cites *United States v. Bozza*, 365 F.2d 206, 220–21 (2d Cir.1966). *Bozza*, however, involved the substantive offense of receipt of stolen goods, the operative verb of which—"receipt"—by its nature contemplates a single physical act. By contrast, 2320(a), as it applies in this case, involves obtaining control of counterfeit goods with the intent to transport, transfer, or dispose of such goods. The very nature of the offense of "trafficking" contemplates a continuing offense, one which *begins* with obtaining control over the counterfeit goods, continues with the transport, and ends with the transfer or disposal of such goods. Thus, the acts of purchasing and shipping the Beanie Babies cannot be said to be merely preparatory to the substantive offense of trafficking.

The other cases upon which DeFreitas relies are equally inapplicable here, as none involves construction of § 2320(a).

Hence, as the substantive offense is a continuing offense, and as it was begun in China, continued in the Southern District, and completed in New Jersey, venue lies in the Southern District.

### B. *Venue Was Properly Laid With Respect to the Conspiracy Count*

■ It is well-settled that with respect to a charge of conspiracy, venue may properly be laid in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the co-conspirators. *See Rosa,* 17 F.3d at 1541; *United States v. Tannenbaum,* 934 F.2d 8, 12 (2d Cir.1991); *United States v. Ramirez–Amaya,* 812 F.2d 813, 816 (2d Cir.1987). The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there. *See United States v. Naranjo,* 14 F.3d 145, 146 (2d Cir.1994) (*citing Hyde v. United States,* 225 U.S. 347, 362–63, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)).

Under the Rule 29 standard, sufficient evidence was presented at trial to permit reasonable jurors to conclude that DeFreitas conspired with Zhang to commit the trafficking offense. The jurors were able to weigh the evidence of the e-mail and testimony by Zhang in reaching such a conclusion.

■ As sufficient evidence of a conspiracy between Zhang and DeFreitas existed, the passage of the goods through the Southern District constitutes an overt act in furtherance of the conspiracy sufficient to establish venue on this count.

### III. *The Evidence Proved the Existence of a Counterfeit Mark*

DeFreitas maintains that the Government failed to prove, as required under § 2320(a), (1) that the counterfeit Beanie Babies had a counterfeit mark that was identical with or substantially indistinguishable from a registered trademark and (2) that the mark was registered at the time DeFreitas purchased them. With respect to each of these allegations, however, sufficient evidence was presented at trial to permit reasonable jurors to conclude that the Government had satisfied its burden of proof.

■ First, actual samples of both the genuine and the counterfeit Beanie Babies, which were introduced into evidence, contained tags with various trademarks registered by Ty, Inc., regarding which the CEO of Ty, Inc. testified; and the jury was free to compare the tags and the marks on the genuine and on the counterfeit Beanie Babies. There was additional expert testimony on the subject as well.

Second, each genuine Beanie Baby introduced into evidence had a tag showing information about Ty, Inc.'s trademarks. A 1998 Ty, Inc. catalogue was also introduced into evidence, which stated that:

> Ty and Beanie Babies are registered trademarks of Ty Inc. © 1998 Ty, Inc.... Warning: All designs and catalog [sic] are registered with the U.S.A./UK Copyright Offices and U.S.A. Customs Restricted Branch. © Ty, Inc. 1998. Ty Inc. has taken and will continue to take vigorous legal action against those who have participated directly or indirectly in the copy, manufacture, sale, distribution or display of unauthorized product. Anyone having information concerning any unauthorized use of product is urged to contact the above company.

In addition, the CEO of Ty, Inc. testified regarding the validity of the marks on the genuine Beanie Babies.

In sum, this constitutes sufficient evidence to permit a jury to conclude that the Government has met its burden of proof that a "counterfeit mark" was used under the meaning of § 2320.

### Conclusion

For the reasons set forth above, DeFreitas' motion is denied.

It is so ordered.